IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


DAVID HENRY CROWEL, *et ux.*,     )

          Plaintiffs    )

       v.         )        No.  3:06-cv-060
                                                (Phillips/Shirley)

CITY OF MADISONVILLE, *et al.*,    )

          Defendants   )


**<u>MEMORANDUM OPINION</u>**


      Alleging a violation of their civil rights pursuant to 42 U.S.C. § 1983,

plaintiffs David and Jennifer Crowel, husband and wife, seek compensatory and

punitive damages arising out of their arrest for disorderly conduct and resisting

arrest[1] by police officers employed by the City of Madisonville, Tennessee (the

"City").  The defendants include not only the City  and five named police officers but

also an unspecified number of "unknown officers."  [*See* Doc. 1, p.1].[2]  More

_____

     [1]While both plaintiffs were charged with disorderly conduct, only Mr. Crowel
was charged with resisting arrest.

     [2]Plaintiffs filed their complaint on February 15, 2006.  Plaintiffs have yet to
identify any of these unknown officers and, because they have failed to identify
them, they have also failed to serve them, clearly in violation of the 120-day
window provided by Fed. R. Civ. P. 4(m).  It must be noted too that discovery as

specifically, plaintiffs allege that these police officers, acting in both their individual

and official capacities, violated their rights under the Fourth Amendment[3] because

they were arrested without probable cause and because the police officers used

excessive force in effecting that arrest.  Plaintiffs also allege that the City is liable

because of its failure to properly train its police officers as to what constitutes

---

to fact witnesses is now closed because that was to have occurred at least 60
days before trial, *i.e.*, at least 60 days before the last assigned trial date of May
22, 2007 [*see* Doc. 11, p.1].  Normally, a dismissal on Fed. R. Civ. P. 4(m)
grounds is without prejudice.  However, this observation, while technically correct,
is of little practical relevance given the fact that even if plaintiffs were permitted to
file their claims today against any other police officers, plaintiffs' claims would be
barred by the applicable statute of limitations.  *See* 3 Moore's Federal Practice, §
4.82[3] ("[A]ny dismissal ordered [under Rule 4(m)] after expiration of the statute
of limitations for failure to establish good cause will be, in effect, with prejudice
since plaintiff will be precluded from commencing a new action.") (citing various
circuit court decisions).  Plaintiffs' claims arose on April 11, 2005, and the
applicable statute of limitations in this case, Tenn. Code Ann. § 28-3-104(3), is
one year.  Thus, even if the court were to dismiss the claims against the unknown
officers without prejudice pursuant to Rule 4(m), plaintiffs' claims against them
would clearly be time-barred.  Consequently, plaintiffs' claims against the
unknown officers will be dismissed with prejudice.

[3]This constitutional proviso recites:

> The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable
> searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly
> describing the place to be searched, and the persons or
> things to be seized.

U.S. CONST. amend. IV.

probable cause to arrest for either disorderly conduct or resisting arrest. Finally, plaintiffs allege a state law cause of action for assault and battery.[4]

This matter is presently before the court on all defendants' motion for summary judgment [Doc. 23]. The issues raised have now been fully briefed by the parties [*see* Docs. 24, 29, 31, 33, and 36], so that this motion is ripe for adjudication. For the reasons that follow, defendants' motion will be granted in part and denied in part whereby summary judgment will be entered in favor of defendants with respect to all § 1983 claims except as to plaintiffs' claim for being arrested without probable cause. As to that claim, the court finds that there are genuine issues of material fact as to whether there was probable cause to arrest either plaintiff for disorderly conduct or Mr. Crowel for resisting arrest. Consequently, plaintiffs' claim on that issue against Detective James D. Bivens and Sergeant John Wilburn, the only two officers who signed the affidavits of complaint against plaintiffs for these charges,[5] must be decided by a jury to determine whether either officer has any liability in his

---

[4]Although plaintiffs set forth a considerable number of causes of action in their complaint [Doc. 1], only these four causes of action remain pursuant to the agreed final pretrial order [Doc. 38] entered by this court on April 17, 2007. *See* Fed. R. Civ. P. 16(e). The court is also cognizant of the fact that defendants contend that this court should not exercise supplemental jurisdiction over plaintiffs' state law claims for assault and battery pursuant to 28 U.S.C. § 1367 [*see id.*, p.1]. For reasons to be discussed later, the court agrees with defendants on this issue.

[5]Detective Bivens signed the two complaints for disorderly conduct and Sergeant Wilburn signed the complaint against Mr. Crowel for resisting arrest.

individual capacity.  The court will also dismiss without prejudice plaintiffs' state law

claims for assault and battery.

## I.

### *Factual Background*

The facts in this case primarily involve a credit card and cussing and, up to a point, are not in dispute. The parties agree that the events that led to the arrests at issue began with plaintiffs' trip, following a typical work day, to the Madisonville Wal-Mart on Monday, April 11, 2005, to pick up a few "odds and ends" which they neglected to purchase over the weekend [*see* Doc. 39-3, p.53].[6] Plaintiffs are regular customers at Wal-Mart, spending between $10,000 to $12,000 a year at that store. On this particular day, plaintiffs had purchased approximately $180 worth of merchandise.

This entire unfortunate and almost unbelievable series of events began when a problem arose in swiping Mr. Crowel's credit card at the check-out counter.[7]

_____

[6]All references to Mr. Crowel's deposition testimony will be to Doc. 39-2 or 39-3, which together comprise his *entire* deposition testimony. Furthermore, all page references to Mr. Crowel's deposition will be to the actual deposition page number - not the docket entry page number. In their motion to supplement the record with Mr. Crowel's entire deposition [Doc. 39], defendants had requested that this deposition be filed as Ex. 5 to their pending motion for summary judgment [Doc. 23]. Nevertheless, because it has been docketed as entries 39-2 and 39-3, the court will reference it accordingly in this opinion.

[7]Although the Crowels consistently refer to this card as a credit card in their depositions [*see, e.g.*, Docs. 31-4, p.3 and 39-3, p.61], the cashier, Tammy Cannon, testifies that it was a debit card [*see* Doc. 23-4, p.1], as does the manager, John Cagle [*see* Doc. 23-3, p.1]. For purposes of this motion, the

Mr. Crowel may have initially tried to swipe the card or the cashier may have initially tried to swipe the card. Either way, the cashier eventually asked Mr. Crowel for his card. This procedure was not unusual because Mr. Crowel purposefully did not put his signature on it so that cashiers are compelled to routinely ask him for identification. Not surprisingly, therefore, this particular cashier asked Mr. Crowel for some ID, and he provided his driver's license to her. This cashier, for whatever reason, also had to get permission from another associate or a supervisor to run the card through or to obtain some sort of approval - Mr. Crowel just did not know. Consequently, another employee did come over to assist the cashier or to approve the purchase. It is at this point in time when the court must segregate by party or witness the various versions of events which subsequently transpired in order to analyze fully the plethora of legal issues raised by defendants' motion.

### David Crowel's Version of Events

While the plaintiffs were waiting for the transaction to be completed, Mr. Crowel noticed that the cashier had laid his credit card with the magnetic strip face-down on the demagnetizer in the scanning area of her work station. Mr. Crowel was familiar with the demagnetizer and knew that it was used to demagnetize the magnetic strip on some items for security purposes. Mr. Crowel expressed his

_____

distinction has no significance. The court will, however, refer to the card as a credit card because plaintiffs do so.

concern, saying, "That's not a good idea to lay that down there.  Please don't lay that there."  [Doc. 39-3 at p.62].  The clerk responded, "I don't believe that really hurts them."  [*Id.* at p.63].  Mr. Crowel then responded, "I'd really appreciate it if you would not lay that on the magnetic strip.  I've had a card ruined for that."  [*Id.*].  Nevertheless, the clerk took the card and moved it back and forth over the magnetic strip, all the while saying, "Well, I really don't believe that.  Do you?"  [*Id.*].  Mr. Crowel then stated, "I can't believe you did that."  [*Id.*].  Mr. Crowel believes that it was at this point in time when another associate came over to approve the sale.  The cashier then asked that associate if the demagnetizer would "mess the card up," and she told her it could.  [*Id.* at p.65].

Mr. Crowel next told his wife that he was going over to the Customer Service desk to speak to a manager.  However, when he went over to the Customer Service desk, he spoke instead with another associate about his problem with the cashier and his credit card.  Mr. Crowel told the associate that he did not appreciate what the cashier did to his card and that Wal-Mart needed to train its associates not to do that.  Mr. Crowel further explained to that associate that he used his credit card to make many purchases, that he was going out of town, that he very rarely carried cash, and that this was his only available credit card.  Mr. Crowel also told the associate that he was concerned that the cashier might have ruined the magnetic

strip on his card.  The associate responded that Wal-Mart did train its associates on that issue and that she would look into the matter.

Mr. Crowel further testifies that all during this conversation with the associate at the Customer Service desk, an individual, who is now identified as Detective Bivens, interrupted him on three occasions.[8]  The first interruption occurred when Bivens told Mr. Crowel that he was being "too loud."  [*See id.*, p.81]. Mr. Crowel did not pay much attention to Bivens because he appeared to be just another customer based on his dress - he was wearing very casual clothing including shorts, a polo shirt, and flip flops or sandals.  Mr. Crowel does admit, however, that he has been told that his "voice carries[,]" *i.e.*, that he could easily be heard "within 50 feet."  [*See id.*, p.67].  Nevertheless, Mr. Crowel testifies he was not being unreasonably loud, yelling, or cursing at that time.

Bivens soon interrupted Mr. Crowel's conversation again, indicating that he was a police officer, to which Mr. Crowel, speaking to the associate, said, "Yeah, right."  [*See id.*, p.83].  The associate immediately  responded, "Oh, no, he is."  [*Id.*]. Mr. Crowel then observed, "Well, he's not on duty."  [*Id.*].

---

[8]Mr. Crowel's testimony clearly identifies the first two interruptions;  it is not so clear, however, as to the third.  As will become apparent, there was a lot of banter between these two.

Bivens indicated, however, that he was on duty "24 - 7." [*See id.*, p.85]. Mr. Crowel likewise stated, "Yeah, Buddy, so am I. I'm on duty 24 - 7, too." [*Id.*]. Mr. Crowel next told Bivens that he was trying to conduct some business, implying that Bivens should mind his own business. Mr. Crowel expected some respect from Bivens since he was on private property and was a paying customer of Wal-Mart. Moreover, he had a complaint with Wal-Mart and not the police.

Eventually, Mr. Crowel became exasperated with his response at the Customer Service desk and simply wanted the general manager's phone number because it was not posted on the wall as in most Wal-Marts. The Customer Service associate left, telling Mr. Crowel that she would come back with the number. Instead, she came back with another manager, John Cagle.

While he was waiting for the Customer Service associate to return, Bivens told Mr. Crowel that he was going to call the police. Mr. Crowel told him that he thought Bivens was a police officer. Mr. Crowel next asked Bivens for his badge and identification, which Bivens did not produce.

Also, while he was waiting, Mr. Crowel went over to talk with his wife about what was occurring at the Customer Service desk, as well as the harassment he was receiving from Bivens. Mr. Crowel told his wife that Bivens claimed to be a

police officer, although he had no identification. Additionally, while waiting, Mr. Crowel spoke with a friend who came by to say, "Hello," and talked with him for a minute.

Shortly afterwards, the Crowels again asked Bivens for his badge. Although Bivens did not have one, he pulled out something akin to a business card or driver's license and Mrs. Crowel reached out to steady it so that she could read it. Mr. Crowel still did not believe that Bivens was really a police officer based on the way he conducted himself.

When the manager returned, Mr. Crowel explained to him what happened including that the associate from Customer Service had asked if she could take his card, ring up a phony sale, and credit it back to see if the card still worked. And, according to the associate, after doing so, the card was still functional. At that point, the manager apologized, telling Mr. Crowel he would look into the matter and take care of it so that no one else would be inconvenienced. Mr. Crowel emphasized the fact that it was critical for his card to work because he had to go out of town and that he had no other credit card. The manager also insisted on giving the Crowels a gift card, and Mr. Crowel told him there was no need for that. Nevertheless, the manager insisted that he take the gift card. According to Mr. Crowel's recollection, his conversation with the manager lasted four or five minutes.

While all of this was occurring, a number of police officers came up and were standing nearby watching the events unfold. Mr. Crowel asked the manager why the police were there, and the manager stated that he had nothing to do with it. The manager further indicated that he was in charge of the store, that it was private property, and that he had no idea what the police officers were doing there. Moreover, according to Mr. Crowel, the manager indicated that he would take care of any problem with the police officers.

When his conversation with the manager ended, Mr. Crowel walked towards his shopping cart near the restrooms. One of the police officers then yelled to him something like, "Where are you going," or "Where do you think you are going?" [*See id.*, p.105]. Mr. Crowel responded by telling him, "My business is done" and "I'm going home." [*Id.*].

Mr. Crowel next became aware that the police officers were "tugging" on him. [*See id.*, p.106]. However, he could not identify which officers grabbed him at that point because his back was to them. Mr. Crowel also said to them, "I am not resisting." [*Id.*]. Mr. Crowel stated that the officers were "pulling [his] arms in different directions and that somebody hit him in the legs to spread his legs apart." [*See id.*, p.107] He also heard one of the officers state, "He's resisting arrest," a statement with which he vigorously disagreed. [*See id.*, p.114]. Additionally, Mr.

Crowel heard his wife ask the police officers what was going on and then observed the officers grab her. By Mr. Crowel's estimation, he was in handcuffs within ten seconds. Defendants Daniel Dockery and John Wilburn then escorted Mr. Crowel to the police car, when Mr. Crowel exclaimed, "This is bullshit." [*See id.*, p.115].

Mr. Crowel also testifies that he did not disrupt any of the activities in the store. In fact, Mr. Crowel does not believe that people were even stopping to listen to what was occurring between him and the Wal-Mart employees. Customer Service was taking care of its business, and other customers were having their sales rung up at the various cash registers. Furthermore, no Wal-Mart employee ever asked Mr. Crowel to calm down.

In apparent support of his excessive force claim, Mr. Crowel testifies that the only injury he received during his arrest was a mark on his wrist about the size of a dime (or less) as the result of the handcuffs being too tight [*see* Doc. 39-2, pp.25, 27]. Although Mr. Crowel alleges in his complaint that he was "slammed" into a wall during his arrest [*see* Doc. 1, p.4], there is no testimony to now support that particular allegation.

**Jennifer Crowel's Version of Events**

Mrs. Crowel testifies that, after she and her husband did their normal Wal-Mart shopping and then some, they went to the cash register to pay for their merchandise. Apparently, because of the amount of the bill, the cashier had to call someone to come over and approve it. While waiting, the cashier laid the credit card down on the magnetic strip. Mr. Crowel then asked her "politely" not to do that because it could demagnetize the card [*see* Doc. 31-4, p.3].[9] The cashier responded, "I don't believe that," and then proceeded to swipe the card over the magnetic strip again [*id.*]. Mr. Crowel asked her again not to do that and also asked to speak to a manager.

After the cashier completed the Crowels' order, she started on the next one with no apology whatsoever to them. Mr. Crowel then went over to the Customer Service desk and Mrs. Crowel moved out of the way and stood in front of the register area so that the customer behind her could complete her transaction.

While the Crowels were talking between themselves and waiting for the manager at the service desk, the individual now identified as Detective Bivens walked "right up into our faces ... like he was trying to butt into the conversation." [*Id.* at 7]. Mrs. Crowel said, "Excuse me, sir, but this is between myself, my husband,

_____

[9]Any reference to a page number regarding Doc. 31-4 is to the page number of the docket entry - not the actual deposition page number.

and Wal-Mart." [*Id.*].  Bivens then stated that he was "a cop." [*Id.*].  Mrs. Crowel pointed out that she did not know Bivens was a police officer when she first told him to excuse himself.  After Bivens told Mrs. Crowel that he was a police officer, she asked if he had any identification.  Bivens pulled out his ID and "shoved it in [her] face and literally moved it in [her] face." [*Id.* at 8].  Mrs. Crowel then reached out to stop him from moving it by touching the corner of his wallet, and he "jerked it away from [her]." [*Id.*].  Bivens never stopped moving his identification long enough for Mrs. Crowel to be able to read it.

Bivens then told Mrs. Crowel that he was calling the police, and she replied, "Okay." [*Id.* at 9].  The Crowels continued to wait at the Customer Service desk for the manager to arrive.  After the manager did so, the Crowels chatted with him briefly.  The employee at the service desk offered to check the Crowels' credit card by actually running it through and then voiding the sale.  The Crowels granted her permission to do so.  Additionally, Wal-Mart gave the Crowels a gift certificate or a gift card for all of their hassle.  Everything ended on a positive note with the manager even making a joke, causing all of them to laugh.  The Wal-Mart manager also told them that he would take care of the police, that he did not call the police, and that he did not need them.

As the Crowels were leaving the store, Mrs. Crowel got a little bit ahead of her husband when she heard a commotion behind her. When she turned around, Mrs. Crowel observed at least six officers around her husband. Mrs. Crowel then exclaimed, "Hey, wait a minute." [*Id.* at 10]. Then one of the officers replied, "Do you know what you just did?" When Mrs. Crowel stated that she did not, the officer informed her that she had just interfered with an arrest. Several Madisonville police officers then grabbed Mrs. Crowel, put her face against the wall, and handcuffed her [*id.*].

Mrs. Crowel also alleges in her complaint that she "was forced to expose her brassiere in the presence of male law enforcement officers and male inmates" while being detained at the Monroe County Jail [*see* Doc. 1, p.4]. However, Mrs. Crowel admits in her deposition that none of these male officers lifted her shirt at the jail and that it was actually a female officer who lifted her shirt after she told Mrs. Crowel she was going to do so. Although Mrs. Crowel testifies that the female police officer did that in front of one of the defendant officers and another male officer in the room, she can identify neither. The only injury Mrs. Crowel received as a result of her arrest was a bruise on her right shoulder "the size of a half dollar" which lasted for one week. [*See* Doc. 23-5, p.60]. However, Mrs. Crowel admits that she bruises quite "[e]asy." [*Id.* at 62]. Moreover, although Mrs. Crowel alleges in her complaint - like her husband - that the arresting officers "slammed" her against a wall during the

course of her arrest, she now admits that there was no mark on her face as a result of having it "smooshed" against the wall as the officers were placing handcuffs on her. [*Id.* at 66].

**Detective Bivens Version of Events**

Detective Bivens went into the Madisonville Wal-Mart on the day in question and walked to the Customer Service desk to return something he had bought either that day or the day before. It was at that point that he heard "the hollering and carrying on" at the cash register at the check out lane, which was approximately ten feet from where he was standing [*see* Doc. 31-5, pp.3-4].[10] Bivens could overhear a male customer (now identified as Mr. Crowel) arguing over his credit card and, in particular, making accusations that Wal-Mart had ruined his card. He also overheard Mr. Crowel demand to speak with someone in management about this incident. Bivens describes Mr. Crowel as being "very, very irate and loud." [*Id.* at 4].

Furthermore, because Mr. Crowel would not "shut up," Bivens testifies that the Customer Service associate was having difficulty determining what had happened [*id.* at 5]. Bivens therefore told Mr. Crowel to, "Hold up a minute. Let her

---

[10]Any reference to a page number regarding the deposition testimony of this or any other defendant will be to the page number of the docket entry - not the actual deposition page number.

ask a question. Hold up." [*Id.*]. However, Mr. Crowel "just wouldn't shut up." [*Id.*].

Mr. Crowel continued to indicate that he wanted to speak to the general manager.

In response, the associate told Mr. Crowel that she would go get a manager. The

associate left briefly and spoke to another associate who was standing on the other

side of Mr. Crowel. The associate then walked back over to him and started to say

something, when Mr. Crowel exclaimed, "Lady, I don't want to speak to you. I want

to speak to the general manager." [*Id.* at 7]. At that point, the associate turned and

left, and Mr. Crowel began speaking in whispered tones to his wife.

     A few minutes later, the associate returned with a male manager.

Bivens overheard Mr. Crowel tell the manager that the Wal-Mart employees "didn't

know what they were doing, they needed training." [*Id.* at 8]. In Bivens' opinion, the

manager was "being as nice as he could be to Mr. Crowel," indicating that he would

find out what had happened and offered to give him "stuff ... ." [*Id.*]. At that point,

according to Bivens, Mr. Crowel became "belligerent," "vulgar," and "loud," although

he could not recall specifically what Mr. Crowel was saying [*id.* at 9]. Bivens told him

to, "calm down." [*Id.*]. Mr. Crowel told Bivens, "This is none of your business. This

is between me and Wal-Mart. This has nothing to do with you." [*Id.*]. At that point,

Officer Bivens placed him under arrest. However, Mr. Crowel insisted that Bivens

was not on duty, even after he had placed him under arrest. Consequently, Bivens

picked up his cell phone and stated, "This is 904. Send me a marked unit to the

Wal-Mart." [*See* Doc. 23-6, p.13]. Bivens also testifies that he wanted a marked unit so that Mr. Crowel could be transported to the jail. Bivens further testifies that he specifically informed Mr. Crowel that he was under arrest for disorderly conduct and told him that he needed to stop and sit down. Despite all of that, Bivens testifies that Mr. Crowel still did not believe that he was a police officer and that he needed to get a police officer over there.

Bivens states that they stood there for a few minutes when Mrs. Crowel realized that her husband had been placed under arrest. Consequently, Mrs. Crowel wanted to see Officer Bivens' ID. Like her husband, Mrs. Crowel could not believe that Officer Bivens was a police officer. Moreover, she informed Officer Bivens that all of this was none of his business and that it was "between us and Wal-Mart." [*See* Doc. 31-5, p.10].

At about this point in time, Sergeant John Wilburn, a named defendant, and Officer Kevin Peak, another named defendant, came onto the scene. While this was occurring, Mr. Crowel continued to talk to the manager, John Cagle. After Sergeant Wilburn arrived, Bivens told him, "Mr. Crowel is under arrest." [*Id.*]. After Mr. Crowel finished the conversation with Mr. Cagle, Bivens then stated to Wilburn, "Sergeant, this guy [Mr. Crowel] is under arrest for disorderly conduct." [*Id.* at 11]. Mr. Crowel, however, started walking away and Sergeant Wilburn advised Mr.

Crowel that he needed to stop because he had just been placed under arrest. But Mr. Crowel just kept walking.

At that point in time, Mrs. Crowel demanded to see Bivens' ID. Officer Bivens responded, "Ma'am, this is my ID from the Madisonville Police Department[.]" [*Id.*]. However, Mrs. Crowel "smacked" the ID out of his hand. [*Id.*]. Consequently, Bivens told Officer Peak to take Mrs. Crowel into custody because she was under arrest for disorderly conduct.

Although Bivens was of the opinion that the Crowels were disrupting Wal-Mart employees from doing their work, he admits that other people were being checked out at the cash registers [*id.* at 6, 14, and 15]. In fact, Bivens admits that Mr. Crowel may not have been interrupting Wal-Mart's business in the least [*id.* at 16].

***Officer Daniel Dockery's Version of Events***

According to Officer Dockery, another named defendant, officers with the Madisonville Police Department, as well as officers from surrounding agencies, including Vonore and Tellico Plains, were attending an in-service training session at the Training Center in Madisonville on the day in question. However, instead of receiving the message that Bivens simply needed a marked unit at the Wal-Mart, all

of these officers received a message from the county dispatcher stating, "904 [Bivens' call number] needs assistance at Wal-Mart."[11]  As a result of this particular type of dispatch call, numerous officers, including officers from other agencies, left the in-service training session and raced to assist the officer who, to the best of their knowledge, needed their immediate help at the Wal-Mart.  In fact, Dockery estimates that up to ten officers responded to this particular dispatch.  Moreover, because the Training Center was only two miles from the Wal-Mart, it was not the least bit inconvenient for such a large number of officers to respond.

When Dockery arrived, he observed Sergeant Wilburn with Mr. Crowel. He overheard Wilburn tell Mr. Crowel that he was under arrest and further observed Wilburn grab Mr. Crowel's right wrist.  Mr. Crowel then "shrugged away from him." [*See* Doc. 23-6, p.5].  Dockery went on to define the term "shrugged away" to mean that Mr. Crowel simply "[p]ulled away" from Sergeant Wilburn.  [*Id.*].  Dockery also heard Mr. Crowel "hollering," although he has no recollection of what he was saying [*see* Doc. 31-7, pp.6-7].

At that point in time, Dockery grabbed Mr. Crowel's left arm and placed the handcuffs on him.  Furthermore, Dockery told Mr. Crowel to quit resisting since

---

[11]In order to keep Officer Dockery's version of events in some context, the court has inserted this bit of information gleaned from the deposition of Sergeant John Wilburn [*see* Doc. 23-5, p.44].

he had tried to shrug away from Sergeant Wilburn. According to Dockery's estimation, it took the two officers about fifteen to twenty seconds to place Mr. Crowel in handcuffs, which is the usual amount of time it takes to do so. Dockery also admits that he did not see Mr. Crowel take a swing or try to punch, hit, or strike any officer or anyone else at the Wal-Mart.

### Sergeant John Wilburn's Version of Events

When Sergeant John Wilburn arrived at the Wal-Mart, Bivens told him that Mr. Crowel was under arrest for disorderly conduct. Sergeant Wilburn's first observation of Mr. Crowel was that he was "actually holding the buggy, getting ready to walk out ... ." [*See* Doc. 31-9, pp.1-2]. In fact, Mr. Crowel was not even looking at the officers as he was walking in the opposite direction. Sergeant Wilburn then shouted, "Mr. Crowel, you are under arrest." [*Id.* at 3]. Mr. Crowel, however, kept pushing the buggy. Sergeant Wilburn advised him again that he was under arrest and put his right hand on Mr. Crowel's wrist. Mr. Crowel responded by saying, "You're not taking me to jail." [*Id.* at 4]. Sergeant Wilburn then told Mr. Crowel not to resist; however, Mr. Crowel pulled away, which he defined as Mr. Crowel's "pulling his entire body with most of the force of his right wrist." [*Id.*]. At that time, one of the other officers, believed to be Daniel Dockery, grabbed Mr. Crowel's left arm and Sergeant Wilburn then put the handcuff on Mr. Crowel's right wrist.

After he was handcuffed, Mr. Crowel uttered, "This is bullshit." [*Id.* at 6]. Sergeant Wilburn and Dockery then escorted Mr. Crowel to the police car, along with Officer Chris Wilburn, another named defendant.[12]   It must be emphasized that Sergeant Wilburn did not hear any cursing by either plaintiff prior to Mr. Crowel's arrest.

### Officer Chris Wilburn's Version of Events

Upon his arrival at the Wal-Mart, Officer Wilburn heard Detective Bivens tell Sergeant Wilburn, "Place him [Mr. Crowel] under arrest," and he further heard Mr. Crowel respond, "You're not putting me in jail," or something to that effect [*see* Doc. 31-8, p.1].  Officer Wilburn further observed Sergeant Wilburn attempt to place handcuffs on Mr. Crowel, and Mr. Crowel "began to pull away violently." [*Id.* at 1-2]. Officer Wilburn defines "violently" to mean that Mr. Crowel was "resisting with enough force that he was using his upper strength ... [to] pull ... away from ... Sergeant Wilburn." [*Id.* at 2].  Officer Wilburn also observed Officer Dockery grab Mr. Crowel by the left arm, and he, too, was met with some resistance.  However, Officer Wilburn admits that Mr. Crowel maybe simply tried to reach for something or was just holding onto the shopping cart.  Officer Wilburn then heard Officer Dockery order Mr. Crowel to "stop resisting[.]" [*Id.*].  At that point in time, Officer Wilburn

---

[12]Officer Chris Wilburn is Sergeant Wilburn's brother [*see* Doc. 23-5, p.46].

assisted Officer Dockery in pulling Mr. Crowel's left arm behind him and Officer Wilburn also told Mr. Crowel to "stop resisting."  [*Id.* at 3].

Officer Wilburn further testifies that it did not take more than ten to fifteen seconds for the officers to place handcuffs on Mr. Crowel.  Furthermore, Officer Wilburn admits that Mr. Crowel did not strike out at anyone.  In fact, Officer Wilburn has no recollection of Mr. Crowel even speaking to anyone present.  Finally, Officer Wilburn testifies that, in his view, there was probable cause for a resisting arrest charge against Mr. Crowel as soon as Mr. Crowel pulled away from the arresting officers.

### Officer Kevin Peak's Version of Events

When Officer Kevin Peak arrived at the Wal-Mart, he observed Detective Bivens attempting to show Mrs. Crowel his identification which got "smacked out of his hand" and landed on the floor.  [Doc. 31-10, p.9].  At that point, Bivens told Peak to detain Mrs. Crowel because she was under arrest [*id.*].  Peak admits, however, that he did not know if Mrs. Crowel hit Bivens' hand or if she just hit Bivens' identification because it all happened so fast [*id.* at 12].

According to Peak, Mrs. Crowel committed the crime of disorderly conduct by smacking the ID out of Bivens' hand [*id.* at 16].  Nevertheless, Peak

acknowledges that if Mrs. Crowel were grabbing at the ID to steady it in order to clearly look at the ID, that would not constitute disorderly conduct [*id.*].

### *Witness John Cagle's Version of Events*

In support of their motion for summary judgment, defendants have filed the affidavit of John Cagle, the co-manager of the Madisonville Wal-Mart [*see* Doc. 23-3, p.1]. In his affidavit, Mr. Cagle testifies verbatim as follows:

. . .

3.      On [April 11, 2005], I received word from one of my floor supervisors that a customer was causing a disturbance by acting in a very agitated manor [sic] by being very loud and by using vulgar language. I later learned that the individual was David Crowel.

4.      I approached Mr. Crowel and had a discussion with him regarding the status of his debit card and whether or not it had been deactivated by a magnetic strip at a cashier's station. After determining that it was not damaged, Mr. Crowel turned to leave.

5.      I observed a uniformed officer, whose name I am not aware of, calmly approach Mr. Crowel and he asked Mr. Crowel to step to the side to talk to him. Mr. Crowel was immediately upset, loud, and was acting in a threatening manner. He shrugged away from the officer who was trying to talk to him.

6.      At that time, I saw a woman, who I later learned was Jennifer Crowel, coming back towards Mr. Crowel and the officers, kicking and screaming loudly. She was using the "f" word repeatedly.

7.     At that time, an officer tried to handcuff Mr. Crowel and he resisted the attempt. It looked to me as if he was fighting with them in their efforts to handcuff him. The altercation spread to the point where Mr. Crowel forced the officers into a bathroom enclave and out of my view. In only a matter of seconds, they were all back out in the main portion of the floor. Mr. Crowel was handcuffed. The officers quickly and without incident escorted Mr. Crowel out of Wal-Mart.

8.     It appeared to me that the officers were only wanting to talk to Mr. Crowel and he resisted their efforts to do so. It also appeared to me that Mr. Crowel resisted the officers' attempts to handcuff him, that he, not the officer, instigated the altercation with the officers.

[*Id.*, pp.2-3].

### *Witness Tammy Cannon's Version of Events*

In further support of their motion for summary judgment, the defendants have filed the affidavit of Tammy Cannon, the assistant manager of the Madisonville Wal-Mart [*see* Doc. 23-4, p.1]. In her affidavit, Ms. Cannon testifies verbatim as follows:

. . .

3.     During my shift on [April 11, 2005], I was summoned by a cashier to her station because a complaint had been made by a customer that his debit card had been deactivated by a magnetic strip. I was aware at that time the Wal-Mart cashier system could not deactivate credit cards. At the cashier's station were two individuals who I later became aware were David and Jennifer Crowel.

4.     As soon as I walked up it was clear Mr. Crowel was extremely angry and agitated. He was making statements about the cashier ruining his debit card because she put it on a magnetic strip. Several times he referred to the cashier as "the f**king cashier." He was very loud and used vulgar language on several occasions. He was waiving his arms about. He was talking so loudly and so angrily that it was very difficult for me to understand him. I asked him to calm down and told him that I could not help him if he would not quit yelling. Because of his behavior and the way he was waving his arms I became nervous and took a step back. At that time he took a step towards me and continued yelling and waving his arms. I felt threatened by his behavior. At that time, he told me to get a male manager because he did not want to speak with a female. At that time, I left the cashier station and sought assistance from a male manager.

5.     I observed a plain clothed [sic] officer with the Madisonville Police Department, who I later learned was James Bivens, calmly ask Mr. Crowel to calm down. Mr. Bivens told Mr. Crowel that I could not help him if he didn't calm down, and there were a bunch a kids around and he needed to calm down.

6.     After several more minutes of discussion between both of the Crowel's [sic] and a male manager with Wal-Mart[,] I observed several uniform officers attempting to arrest the Crowel's [sic]. I observed Mr. Crowel resist the attempts by the officer's [sic] [to] grab his arms to handcuff him.

7.     At no time did I see the officers using any weapons or any type of force that I felt was unreasonable in that situation.

[*Id.*, pp.2-3].

***Undisputed Post-Arrest Facts***

As a result of the above incident, Detective Bivens filed a criminal complaint against both of the plaintiffs for the offense of disorderly conduct in violation of Tennessee Code Annotated § 39-17-305 [*see* Doc. 31-3, pp.1,5]. Additionally, based on the above incident, Sergeant Wilburn filed a criminal complaint against Mr. Crowel for the offense of resisting arrest in violation of T.C.A. § 39-16-602 [*id.*, p.3].

As a result of their arrests, the Crowels were incarcerated for five to seven hours. [Doc. 39-3, p.123]. In addition, the Crowels were required to pay court costs in the amount of over $700 as the result of these three charges; however, the actual charges were dismissed upon payment of those costs [*see* Doc. 39-2, pp.32-33; *see also* Doc. 31-3, pp.2,4]. The court also ordered the Crowels to stay out of the Madisonville Wal-Mart as a result of these offenses [*see* Doc. 39-3, pp.122-23].

***Relevant Testimony Regarding the City's Liability***

As previously noted, plaintiffs have alleged that the City is liable in this incident for failing to train its officers "to properly determine what lawfully constitutes probable cause to arrest for disorderly conduct and/or resisting arrest." [Doc. 38, p.1]. With respect to that issue, Greggory Breeden, the Chief of Police, testifies that it was one of his responsibilities to train the Madisonville police officers on the issue

of probable cause [Doc. 31-6, p.1]. In fact, Chief Breeden designates a training officer to handle that training and to design the different training courses [*id.*]. Furthermore, to determine the specific training needs of the department, Chief Breeden schedules supervisory meetings and personally attends those meetings [*id.* at 1-2]. However, Chief Breeden emphasizes that these meetings are "a round-table discussion" as opposed to a formal meeting [*id.* at 2].

Mr. Crowel, on the other hand, admits that he has no familiarity with the policies of the Madisonville Police Department [Doc. 39-2, p.21]. Nor does Mr. Crowel have any knowledge about the training policy, procedures, or requirements of the Madisonville Police Department [*id.*]. Similarly, Mrs. Crowel testifies that she has no training in the police field, nor does she have any knowledge of the policies or procedures of the Madisonville Police Department [*see* Mrs. Crowel's Deposition, pp.37-38].[13]

## II.

### *Summary Judgment Standard*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any,

---

[13]Although this portion of Mrs. Crowel's deposition testimony was provided in the courtesy copy of defendants' exhibits forwarded to chambers, the court was unable to locate this particular testimony in the actual court record.

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323.

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question; but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251-

52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

### III.

### *Liability of the City and the Defendants in their Official Capacities*

Title 42, U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

It is well settled that municipalities and other local governmental bodies are "persons" within the meaning of § 1983. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 689 (1978). The Supreme Court has also recognized that a municipality may not be held liable under § 1983 solely because it employs a tortfeasor. *Id.* at 692. The Supreme Court has consistently refused to hold

municipalities liable under a theory of *respondeat superior*. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985) (plurality opinion).

Even more recently, the Supreme Court has held in *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997), as follows:

> As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Id.* at 404. The *Brown* Court observed further:

> Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

*Id.* at 405 (citations omitted). Moreover, as articulated by the Sixth Circuit in *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996), the "deliberate indifference" identified above "does not mean a collection of sloppy, or even reckless, oversights;

it means evidence showing an obvious, deliberate indifference ... ."  Not only must a policy be identified, but "considerably more proof than [a] single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation."  *Tuttle*, 471 U.S. at 823.

Here, the court finds that plaintiffs have failed to raise a genuine issue of material fact as to whether the City had a policy or custom leading to the alleged injuries.  Plaintiffs have made the bare allegation that the City has failed to properly train its officers to "determine what lawfully constitutes probable cause to arrest for disorderly conduct and/or resisting arrest."  [Doc. 38, p.1].  Based on the fully developed record, however, plaintiffs have done nothing more than speculate, based on one incident, that the City's police officers are not adequately trained in this particular area.  Plaintiffs candidly admit that they have no training in the police field, nor do they have any knowledge of the City's policies or procedures, nor do they have any knowledge regarding the training requirements of the City for its police officers.  Plaintiffs have proferred no expert report or testimony regarding the City's purported failure to train its officers and have therefore failed to produce any evidence of any policy which illustrates a deliberate indifference to their constitutional rights.  To the contrary, the only deliberate conduct by the City in this record is reflected in Chief Breeden's testimony that he does train his officers

regarding what constitutes probable cause, specifically designating a training officer to do so and to design appropriate training courses. In fact, Chief Breeden testifies that he personally attends those meetings.

In view of this record, plaintiffs' claims against the City must be dismissed. Furthermore, because these claims are being dismissed against the City, there is no basis for this lawsuit to continue against any of these police officers in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding that ... "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Accordingly, those claims will likewise be dismissed.

IV.

### *Individual Liability of the Officers*

#### A.  Probable Cause

Plaintiffs have also filed suit against the police officers in their individual capacities seeking to impose personal liability upon them for taking action under color of state law by arresting them without probable cause. Defendants contend, however, that they are entitled to summary judgment as a matter of law because

they had probable cause to arrest both plaintiffs for disorderly conduct and to arrest Mr. Crowel for the additional offense of resisting arrest.

The Supreme Court has defined "probable cause" as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). *See Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975) ("a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime."). Probable cause requires only the probability of criminal activity, not some type of "prima facie" showing. *Illinois v. Gates*, 462 U.S. 213, 235 (1983). If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant. *Scott v. United States*, 436 U.S. 128, 138 (1978). Even more recently, the Supreme Court has observed:

> Our cases make clear that an arresting officer's state of mind (except for the facts he knows) is irrelevant to the existence of probable cause ... . "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." "[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer."

*Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004) (citations omitted). "[P]robable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (citing *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

Furthermore, it is well settled that a valid arrest based on then-existing probable cause is not vitiated if the suspect is later found innocent. *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).[14] In other words, a probable cause determination, even if wrong, is not actionable as long as the determination passes the test of reasonableness. *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993). Reasonableness is a question of law to be decided by the trial judge. *Hunter v. Bryant*, 502 U.S. 162 (1991).

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *DeFillippo*, 443 U.S. at 36 (citing *Ker v. California*, 374 U.S. 23 (1963), and *Johnson v. United States*, 333 U.S. 10 (1948)). "Where probable cause exists, '[a] police officer is permitted to make an arrest without a

---

[14]Here, of course, neither plaintiff was found innocent because Mr. Crowel admits that he paid over $700 in court costs as a result of the offenses charged against his wife and him. By the same token, however, plaintiffs were not found guilty since the charges against them were dismissed upon payment of these costs.

warrant for a misdemeanor committed in his presence.'" *United States v. Reed*, 220 F.3d 476, 478 (6th Cir. 2000) (quoting *United States v. Smith*, 73 F.3d 1414, 1416 (6th Cir. 1996)).

Both plaintiffs were arrested and charged with disorderly conduct in violation of Tennessee Code Annotated § 39-17-305, which states as follows:

> **Disorderly conduct.** - (a) A person commits an offense who, in a public place and with the intent to cause public annoyance or alarm:
>
> > (1) Engages in fighting or in violent or threatening behavior;
> >
> > (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
> >
> > (3) Creates a hazardous or physically offense condition by any act that serves no legitimate purpose.
>
> (b) A person also violates this section who makes unreasonable noise which prevents others from carrying on lawful activities.
>
> (c) A violation of this section is a Class C misdemeanor.

Additionally, Mr. Crowel was charged with resisting arrest in violation of Tennessee Code Annotated § 39-16-602(a), which states as follows:

(a)  It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer ... from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer ... .

The question becomes, therefore, viewing the facts in the light most favorable to the plaintiffs, whether Detective Bivens was justified in his belief that both plaintiffs had committed the crime of disorderly conduct and whether Sergeant Wilburn was justified in his belief that Mr. Crowel had committed the additional crime of resisting arrest.  Furthermore, in analyzing this issue, the court must consider the fact that all defendants have asserted the defense of qualified immunity regarding their various roles in plaintiffs' arrests.


"[T]he Supreme Court [has] held that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'".  *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "'The central purpose of affording public officials qualified immunity from suit is to protect them from undue interference with their duties and from potentially disabling threats of liability.'"  *Id.* (quoting *Elder v. Holloway*, 510 U.S. 510, 514

(1994)) (internal quotation marks omitted).  Courts traditionally employ a three-step

test in reviewing claims for qualified immunity:

> First, we determine whether, based upon the applicable
> law, the facts viewed in the light most favorable to the
> plaintiff [] show that a constitutional violation has occurred.
> Second, we consider whether the violation involved a
> clearly established constitutional right of which a
> reasonable person would have known.   Third, we
> determine whether the plaintiff has offered sufficient
> evidence to indicate that what the official allegedly did was
> objectively unreasonable in light of the clearly established
> constitutional rights.

*Sample v. Bailey*, 409 F.3d 689, 695-96 (quoting *Feathers v. Aey*, 319 F.3d 843, 848

(6th Cir. 2003)) (alteration in original).  Consequently, if the police officers acted in

an objectively reasonable manner, as assessed in the light of clearly established law

at the time of the conduct at issue, they will be insulated by qualified immunity.

*Harlow*, 457 U.S. at 818.  Thus, even if a police officer has deprived a plaintiff of a

federal right, qualified immunity will apply if an objectively reasonable officer would

not have understood, by referencing clearly established law, that his conduct was

unlawful.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998);  *Rich

v. City of Mayfield Hts.*, 955 F.2d 1092, 1095 (6th Cir. 1992).  Whether an asserted

federal right was clearly established at a particular time presents an issue of law.

*Elder*, 510 U.S. at 516.   In inquiring whether a constitutional right is clearly

established, a trial court must look first to decisions of the Supreme Court, and then

to decisions of the Sixth Circuit, and other courts within the circuit, and finally to decisions of other circuits. *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (citation omitted).

"The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Rich*, 955 F.2d at 1095 (citation omitted). Claims of qualified immunity are assessed on a fact-specific basis to ascertain whether the particular conduct of the defendant police officers infringed on the clearly established federal right of the plaintiff, and whether an objective, reasonable officer would have believed that his conduct was lawful under extant federal law. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

With respect to an arrest without probable cause, courts will not grant immunity to a defendant if no reasonably competent peace officer would have found probable cause. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). In other words, "[i]t is clearly established that arrest without probable cause violates the Fourth Amendment." *Klein v. Long*, 275 F.3d 544, 550 (2001) (quoting *Donovan v. Thames*, 105 F.3d 291, 297-98 (6th Cir. 1997)). Where the reasonableness of an officer's actions hinge on disputed issues of fact, "the jury becomes the final arbiter of ... immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Brandenburg v. Cureton*, 882 F.2d

211, 215-16 (6th Cir. 1989). In other words, "[p]robable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry." *Swiecicki v. Delgato*, 463 F.3d 489, 498 (6th Cir. 2006) (citation omitted). Moreover, a police officer may not base his probable-cause determination on speech protected by the First Amendment. *Id.* (citing *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997)).[15] Thus, this court must determine whether Detective Bivens arrested the Crowels on this basis. It must be noted, however, that in the case of Mr. Crowel, to the extent that probable cause existed for either of Mr. Crowel's charges (disorderly conduct or resisting arrest), the arrest would be lawful with respect to the probable-cause requirement. *Swiecicki*, 463 F.3d at 498 (citing *Lyons v. City of Xenia*, 417 F.3d 565, 573-75 (6th Cir. 2005) (granting qualified immunity to the defendant officers on the plaintiff's probable-cause claim)).

(i) *Mr. Crowel's Probable-Cause Claim*

In determining whether Detective Bivens had probable cause to arrest Mr. Crowel, the court must focus only on those facts within Bivens' knowledge at the moment Mr. Crowel was arrested. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (holding that the probable-cause inquiry focuses on facts within the arresting officer's

---

[15]Although defendants contend that this is not a First Amendment case, this court must, nevertheless, consider the First Amendment in determining whether plaintiffs' Fourth Amendment rights were violated. Clearly, the criminal complaint alleges that Mr. Crowel was arrested in part for "using volgur [sic] language ... ." [Doc. 31-3, p.1]. *See Swiecicki*, 463 F.3d at 498.

knowledge at the time of the arrest).  Nevertheless, the court is still required to consider the facts in the light most favorable to Mr. Crowel.  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004).

Mr. Crowel argues that his actions did not rise to the level of disorderly conduct because he neither engaged in threatening behavior nor did he make "unreasonable noise which prevents others from carrying on lawful activities." T.C.A. § 39-17-305(a)(1) and (b).[16]  Mr. Crowel candidly admits that he was talking loudly; however, he also testifies that he has been told frequently that he always talks loudly.  Thus, there was nothing unusual about this particular aspect of his communication to the Wal-Mart employees.  Additionally, it is easy to understand why Mr. Crowel was upset since, according to his testimony, the Wal-Mart cashier had repeatedly run his credit card over the demagnetizer in spite of his specific instructions not to do so.  If true, Mr. Crowel's raising his voice to express his dissatisfaction to the cashier and later to a supervisor and manager is understandable.

Bivens also accuses Mr. Crowel of using profane language;  however, Mr. Crowel denies that he used profane language, and he also argues that the

---

[16]The court's reading of this statute reveals no other arguable violations thereof by Mr. Crowel.

content of his speech would have been protected by the First Amendment even if profane. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (holding that the only type of language not First Amendment protected is fighting words); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (clarifying *Chaplinsky* and holding that even though a particular "mode of speech" (such as fighting words) may not be protected by the First Amendment, "the underlying message" still receives First Amendment protection). Consequently, Bivens lacked probable cause to arrest Mr. Crowel if Bivens based his decision on protected speech. *See Sandul*, 119 F.3d at 1256 (holding that an officer could not rely solely on protected speech to establish probable cause). Here, the record suggests such a motivation because Bivens indicated on the criminal complaint that he arrested Mr. Crowel based on his "volgur" [sic] language [*see* Doc. 31-3, p.1].

Even though Bivens did not have probable cause to arrest Mr. Crowel based on the content of his speech, the court must also consider if the manner of Mr. Crowel's speech was sufficient to lead Bivens to believe that probable cause existed. In support of that prong of its motion, defendants rely heavily on the affidavit testimony of Tammy Cannon, who testifies among other things that she felt "threatened by [Mr. Crowel's] behavior" [*see* Doc. 23-4, p.2]. If true, this would provide an arguable basis for Mr. Crowel's arrest pursuant to the disorderly conduct, as he would have engaged in "threatening behavior ... ." T.C.A. § 39-17-305(a)(1).

Here again, however, Mr. Crowel denies that he engaged in any threatening behavior towards Ms. Cannon or, for that matter, any other Wal-Mart employee. Rather, he only admits that he was talking loudly. Moreover, it is noteworthy that no Wal-Mart employee called the police about Mr. Crowel's threatening behavior or, even more baffling, complained to one of the ten officers upon their arrival. Mr. Cagle, according to Mr. Crowel, even expressed surprise regarding the presence of the ten police officers. Summary judgment is therefore not appropriate where issues of credibility are determinative of these predicate factual issues.

Defendants next contend that they had probable cause to arrest Mr. Crowel on another portion of the disorderly conduct statute, *i.e.*, making an "unreasonable noise which prevents others from carrying on lawful activities." T.C.A. § 39-17-305(b). Specifically, defendants rely on the affidavit of Wal-Mart employees John Cagle and Tammy Cannon, as well as Bivens' deposition testimony. However, Mr. Crowel testifies that he did not disrupt any activity in the store. In fact, Mr. Crowel testifies that other cashiers were ringing up sales, buggies were going by, and people were entering and leaving Customer Service. More significantly, Mr. Crowel testifies that no Wal-Mart employees complained to him or asked him to calm down. Finally, Mr. Crowel's testimony that Mr. Cagle indicated that he would take care of the police after they had fully discussed and resolved all problems between the Crowels and Wal-Mart is particularly telling. The court thus finds that there is a

genuine issue of material fact as to whether Mr. Crowel has violated that subsection of the disorderly conduct statute.

Turning next to Mr. Crowel's other offense, resisting arrest, Detective Bivens and other officers uniformly testify that Mr. Crowel jerked his arm away while the officers were attempting to arrest him. This testimony is further buttressed by the affidavits of Wal-Mart employees Cagle and Cannon. Nevertheless, a careful examination of Mr. Crowel's testimony indicates that he was simply pushing his buggy away, in view of Mr. Cagle's comments that he would take care of the police, when the officers came up from behind him, startling him in the process of placing him under arrest. There is certainly no testimony that Mr. Crowel engaged in any sort of egregious conduct when the whole process lasted anywhere from ten to twenty seconds. The court concludes, viewing the facts in the light most favorable to Mr. Crowel, that he was well within his rights to jerk away in a startled manner when he had no expectation that he would be placed under arrest by these officers as he was leaving Wal-Mart, especially since Mr. Cagle had just told him that he would take care of the police. All of this, of course, is for a jury to decide as to whether probable cause existed for the resisting arrest issue as well.

Finally, the court concludes that Detective Bivens and Sergeant Wilburn are the only officers with any potential liability to Mr. Crowel. Bivens, and Bivens

alone, made the initial decision that he had probable cause to arrest Mr. Crowel for the misdemeanor offense of disorderly conduct. Bivens then made the ill-fated phone call to the Madisonville Police Department requesting a marked unit which, as it turns out, resulted in at least ten officers responding to a minor disturbance at most. Bivens also signed the affidavit of complaint against Mr. Crowel. Similarly, Sergeant Wilburn was the one officer who made the determination that Mr. Crowel had resisted arrest, and he signed an affidavit of complaint against Mr. Crowel for that offense.

In view of these facts, the court finds that the other police officers who were merely present at Mr. Crowel's arrest, but were not directly responsible for making the determination regarding these offenses, are entitled to qualified immunity from suit under § 1983. *See Ghandi v. Police Dept.*, 747 F.2d 338, 352 (6th Cir. 1984). Consequently, Officers Dockery, Peak, and Chris Wilburn have no potential liability to Mr. Crowel for his arrest because these officers had a reasonable belief, based on Detective Bivens' representations about what had occurred before they arrived, that Mr. Crowel had behaved in a disorderly manner in violation of the law.

(ii) *Mrs. Crowel's Probable Cause Claim*

As before, this court must determine whether Detective Bivens had probable cause to arrest Mrs. Crowel for the offense of disorderly conduct. Once

again, the court must consider the facts in the light most favorable to Mrs. Crowel. *See Champion*, 380 F.3d at 900.

According to Bivens, Mrs. Crowel smacked the ID out of his hand when he attempted to show it to her. Similarly, Officer Peak testifies that Mrs. Crowel may have smacked the ID out of Bivens' hand. Bivens thus told Peak to detain her and place her under arrest.

Nevertheless, Mrs. Crowel testifies, in effect, that she did not intend to knock the ID from Bivens' hands; rather, she was attempting to steady it because he was moving his hand by her face so quickly that she could not read his ID. Consistent with this description, Peak also testifies that he did not know whether Mrs. Crowel hit Bivens' hand or she hit his ID because it happened so fast. Mrs. Crowel further testifies that it was her recollection that she was arrested for merely uttering, "Hey, wait a minute," to which one of the officers replied that she had just interfered with an arrest.

This testimony by Mrs. Crowel, like much of the testimony by Mr. Crowel, is extremely troubling. It appears to this court that, if a jury were to believe the testimony of one or both of the Crowels, the jury would readily conclude that these officers retaliated against the Crowels for asserting their First Amendment

rights.  The Sixth Circuit has held that an adverse state action "motivated at least in part as a response to the exercise of the plaintiff's constitutional rights" presents an actionable claim of retaliation.  *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyal*, 429 U.S. 274 (1977)).  "The right of an American citizen to criticize public officials and policies ... is 'the central meaning of the First Amendment.'"  *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 273 (1964)).  "There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment."  *McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 520 (6th Cir. 2001) (citations omitted).  "[T]he First Amendment right to criticize public officials is well established and supported by ample case law.  Furthermore, it is well established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983."  *Barrett v. Herrington*, 130 F.3d 246, 264 (6th Cir. 1997).  Finally, the court notes that, "Government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity."  *Bloch*, 156 F.3d at 682 (quoting *Duran v. Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).

In view of the above authorities, the court finds that Mrs. Crowel has created a genuine issue of material fact as to whether Detective Bivens had probable cause to arrest her for disorderly conduct when all she may have done was to have the audacity to question the officers' arrest of her husband, clearly a violation of her First Amendment rights. If Mrs. Crowel's version of events is to be believed by a jury, Detective Bivens may have arrested Mrs. Crowel for what he perceived to be a slight to his dignity, which is not allowed by applicable law. *See id.* This is especially true given the fact that there is a genuine issue of material fact as to whether Mrs. Crowel smacked the ID out of Bivens' hand, or whether she was trying to grab his hand in order to read an ID which he was quickly passing before her face. This matter must, of course, be resolved by a jury to determine whether Bivens is entitled to qualified immunity because Bivens was the one officer who signed the affidavit of complaint against Mrs. Crowel.

The other defendant officers, however, were merely present at the scene of Mrs. Crowel's arrest, and there is no evidence to demonstrate that they were directly responsible for determining that probable cause existed to arrest her. Rather, those officers were simply following Bivens' directive to arrest her. Hence, the court will dismiss her § 1983 claim against Officers Dockery, Peak, and Wilburn, as well as Sergeant Wilburn. *See Ghandi*, 747 F.2d at 352.

## B. Excessive Force

Both plaintiffs claim that the police officers used excessive force in violation of their constitutional rights in effecting the arrests. Defendants counter that, as a matter of law, they did not use excessive force in doing so and that, assuming, *arguendo,* that excessive force was used, they are protected from liability by qualified immunity because their actions arose in the course of performing their official duties.

This court has previously set forth its qualified immunity analysis as a general proposition and it need not be revisited. It is well established that individuals have a constitutional right to be free from excessive force during an arrest. *See, e.g., Graham v. Conner*, 490 U.S. 386, 388 (1989); *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 173 (6th Cir. 2004). A claim of excessive force in the context of "an arrest, investigatory stop, or other 'seizure'" is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 388. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the counter-vailing governmental interest at stake." *Id.* at 396. In considering whether a police officer acted reasonably while performing an arrest, the court must pay "careful attention to the facts and circumstances of each particular case," *id.* at 396, and

"consider the difficulties of modern police work." *Smith v. Freland*, 954 F.2d 343, 346 (6th Cir. 1992).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight ... . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

*Id.* at 346-47 (quoting *Graham*, 490 U.S. at 396-97). An officer making an arrest has "the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

The Court has identified three factors that lower courts should consider in determining the reasonableness of force used: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officer or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id.*; *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). These factors are not an exhaustive list, as the ultimate inquiry is "whether the totality of the circumstances justifies a particular sort of seizure." *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396).

In light of the above case law, and viewing the record in the light most favorable to the Crowels, the court concludes that plaintiffs have not set forth facts sufficient to establish a genuine issue of material fact as to whether any of the officers used excessive force in arresting them on April 11, 2005. Originally, the plaintiffs alleged in their complaint that the officers' excessive force was borne out by the fact that they were each "slammed" into a nearby wall in the course of their arrests [*see* Doc. 1, p.4]. However, the testimony of the Crowels does not lend any support for this or any other claim of excessive force against the police officers. For example, Mr. Crowel's deposition testimony reveals that the only injury he received was a mark on his right wrist smaller than a dime that was caused by the handcuffs [*see* Doc. 39-2, pp.25,27]. Moreover, Mr. Crowel did not have any torn articles of clothing or any other marks on his body as a result of his arrest [*see* Doc. 39-3, p.107]. Without question, the officers did use some physical force in arresting Mr. Crowel, but it also appears, from the officers' standpoint, that Mr. Crowel was walking away from them after he had been placed under arrest and that Mr. Crowel may have attempted to pull away from them as they grabbed him to place him under arrest. Nevertheless, given the amount of time in which the police quickly placed Mr. Crowel under arrest, *i.e.*, ten to twenty seconds, and given the totality of Mr. Crowel's testimony, the court finds that the police used no more force than necessary to effect Mr. Crowel's arrest and that the amount of force used by the

police officers to arrest Mr. Crowel was objectively reasonable under the circumstances.

Similarly, Mrs. Crowel's deposition testimony does not support her claim of excessive force. Mrs. Crowel testifies only that the arresting officer "grabbed [her] arms and put [her] in handcuffs." [Doc. 23-5, p.63]. Additionally, the police officer "pulled [her right arm] behind [her] and put it in cuffs, and the left one [she] gave to him freely." *Id.* The arresting officer then "walked [her] over to the wall and put [her] in the wall and made sure the cuffs were done, and then he passed [her] on to the individual who transported [her]." [*Id.* at 63-64]. Mrs. Crowel's testimony describes at most a "garden-variety" arrest. All of her testimony is completely consistent with the use of appropriate physical force in effecting an arrest. To rule otherwise would require an officer to arrest a suspect without grabbing or even touching that individual, an impossible proposition. The court therefore finds that the amount of force used by the police officers to arrest Mrs. Crowel was objectively reasonable under the circumstances.

It appears that plaintiffs' claims for excessive force are really claims for an excessive show of force because at least ten officers arrived at the Wal-Mart in response to a relatively minor disturbance. There is, however, no §1983 cause of

action for an excessive show of force.  Accordingly, plaintiffs' claims for excessive

force will be dismissed with prejudice against all defendants.

### C. State Law Claim for Assault and Battery

Because this court has dismissed plaintiffs' federal claims for excessive force, this court will decline to exercise supplemental jurisdiction over plaintiffs' closely related state law claims for assault and battery. *See* 28 U.S.C. § 1367(c)(3). *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Said otherwise, if plaintiffs' claims for excessive force were still viable, then it would make sense from the standpoint of judicial economy to try plaintiffs' state law claims for assault and battery in conjunction with this federal action. However, the only federal cause of action which remains involves probable cause, requiring the jury to analyze those claims in the context of both the First and Fourth Amendments. The remaining claims are very complex and troublesome and, in the court's view, to try any state law claims for assault and battery in conjunction with those federal claims might confuse the jury or, at a minimum, distract the jury from the primary issues in this case. Consequently, those state law claims will be dismissed without prejudice.[17]

---

[17]The fully developed record indicates that plaintiffs' state law claims for assault and battery are extremely weak. The court would strongly urge plaintiffs to consider carefully whether it would be prudent to refile these claims in state court.

### *Conclusion*

In ruling as it has, this court is compelled to make a few final observations in the hope that the parties will seriously consider the mediation of these remaining claims.  First, this is indeed a case in which a jury will probably be very sympathetic with the plaintiffs.  Mr. Crowel's anger and perhaps wrath is quite understandable because of the irresponsible manner in which the Wal-Mart cashier conducted herself with Mr. Crowel's credit card.  It is even more understandable when one considers the fact that Mr. Crowel specifically asked her not to place the card near the magnetic strip and that she continued to do so regardless.  Moreover, it must be remembered that Mr. Crowel only had one credit card, he traveled frequently, he carried no cash, and therefore it was necessary for him to have access to his one credit card.

Second, Detective Bivens could have handled this incident much more diplomatically and probably defused the entire situation so that these arrests were unnecessary.  This is especially true given the fact that Detective Bivens was not even in uniform at the time he felt compelled to assert his authority.  Perhaps a more seasoned officer and certainly one with thicker skin might have avoided all of this involvement by law enforcement.  However, the court recognizes that once ten

officers from the Madisonville Police Department arrived on the scene, there was no way that they were going to leave without taking someone into custody.  This court is of the definite and firm opinion that this case does have settlement value so that the parties should seriously consider mediation before incurring further litigation expenses.

Order accordingly.

_____**s/  Thomas W. Phillips**_____
UNITED STATES DISTRICT JUDGE